This time we'll hear Progressive Credit Union against the City of New York. Good morning. May it please the Court, my name is Todd Higgins with Crosby & Higgins LLP and I represent the appellants. This case arises from the collapse of the regulatory structure governing for hire transportation in the New York City market and really the destruction of what amounts to thousands of small businesses that have operated yellow taxis in this city. I'd like to just start, if I could, today by sort of . . . Obviously, we're not going to debate about that. The question is, why does it fall to us under the Constitution to do something? Yes, and that really is the question that was before the district court. This case really raises the question of why has the industry collapsed and the data point I just want to share with you to start is to frame your question. In fiscal year 2014, the City of New York sold 350 taxi medallions. The answer, unfortunately, to your question is that this change is driven by what causes disruption in so many industries around the country, which is just technology. You see, technology doesn't operate in a vacuum. Technology operates within a regulatory structure that is set as a product of legislative decision making and it's no different with respect to the issue in this case, which is the subject of electronic hails and the argument that isn't this really just the march of technology that has done in the yellow taxi industry? That's not true at all. The first question that really is before the court and that was before the district court is really this question of whether or not as a matter of equal protection, these two industries are now similarly situated. That question turns on whether or not a hail, which is really the thing that anchored the dichotomy in this industry for 80 years, whether that encompasses an electronic hail. Now, we have argued repeatedly that it does and that to allow companies like Uber to use an electronic device to hail immediate transportation is to eviscerate a statutory grant that was afforded to medallion owners in exchange for payment. The medallion cabs are the only ones that can take street hails. And that is right. And the question as a matter of statutory- You mean that that is a right of diminishing value, but it's still a right that they have. But that presupposes that the meaning of hail is something that you or I can just sit here and say, well, we know what that means, but that is not at all the case and that is not at all the record. My problem is the meaning of hailing so that the electronic hailing can be closer and closer to the physical hailing that you're doing. Well, the threshold question is what did the New York State Legislature, for example, mean when it enacted a law that said that present and future medallion owners would have the exclusive right to accept hails on the street? It didn't say a subset of hails. It didn't say if you raise your hand or if you whistle or if you flick a light on a hotel building off and on to signal that someone wants a taxi. All of those, indisputably for purposes of the pleading, are established and recognized by appellees as forms of hail. All of them are within the ambit of this exclusive statutory right. So the question is, does that right encompass an electronic means? And to understand that, you have to get into the purpose of this legislation. You have to get into the meaning of hail exclusivity. How is it operated? Yes, but it becomes a question of federal law when the gravamen of the complaint, the is that that property interest, which is not seriously disputed, that medallions are a property interest and inherent in that property interest is the exclusive right to those hails. When that right's been taken away, then the question becomes a federal one because the question becomes, have you taken property without just compensation? So the district court was not free at the pleading stage to say, as a matter of law, and certainly without any kind of analysis around that, oh, it is implausible that electronic hails could fall within the ambit of the hail exclusivity right granted by the New York State legislature. Without inquiry, without a factual record, without even analysis, the court just said it. And not only did the complaint avere facts to the contrary, but it avered overwhelming facts to the contrary, including the appellee's own words, their own actions in prior litigation in which they themselves said an electronic hail is just a hail. An electronic hail is just a modern day equivalent. This is on the record and it's in the allegations of the complaint. It has been for decades a phenomenon for hire vehicles showing up in response to reservations made by phone calls. Is that a hail? That is not. That is what New York State law, and then it's amplified in city law, permits those vehicles to do is to accept by prearrangement. So, of course, like hails, again, the question in the law is, well, what's a prearrangement? And that really is the crux of the question. Somebody picking up the receiver and asking the cab company to send a car and somebody pushing some buttons on their handheld. Well, what we allege in the complaint is that the fundamental difference that separated hails from prearrangement up until now was the concept of time. Prearrangement implicates the idea that a car is going to come at some point in the future. Hails are now. In other words, you can never get too early. You can never be too early for a hail, but you can be too early for a prearrangement. So a prearrangement, this idea that what separates the for hire industry in New York is hails on one side, prearrangement on the other. The statute contemplates that a prearrangement by phone establishing a call, even if you said I think the difference was when you have a car service that has two or 300 cars, the reality is that the car is going to be there at some point in the future. Generally speaking, I need a car. OK, I'll be there in 10 minutes. That was a practical constraint on the technology, which you didn't have GPS locating for where I am. You didn't have the kind of technology infrastructure. My question is, why under your definition is that not a hail? It's because it's prearranged in that you scheduled the call, even if I I want this car right away. I can look down this block and see these cars queued up around Atlas. I said we're coming down with luggage and a car right up. Well, you see, again, the issue is I'll be there by the time you're downstairs, Mr. Parker. Why isn't that a hail? So you're asking me that why is that count as prearrangement under New York's practice? Why did New York treat that all these years? As I'm asking why under a hail, as you explain it, isn't that a hail? It's not a hail because it's in my view, the gap in time that that takes, however long, even if the answer is as soon as possible, is still somehow in the future. It contemplates future. Suppose instead of picking up the phone, I just text, send a car right away. Is that a hail? I think it's the same point. I think that the issue is that the concept of time separates those out. I admit, the first to admit that the New York state legislature didn't define prearrangement or hail. Neither of these terms are defined in the law. I have my interpretation of what I think separates them out, but it is a fair question to say. I get to the airport flying in, and I pick up the phone, and I say, we're here now. We have our luggage. They say, okay, and they send, we'll send over a car. It'll be there in three minutes, five minutes, and of course it gets there 20 minutes later. This is prearrangement. It's different. From my point of view, at least, doing that and going to the end of a taxi line where you're going to get the 37th taxi in line are not very, it's just a guessing game as to which is going to work. Well, beyond anything else, I think I leave you with, because I see my time is up, but I leave you with the, we can tangle ourselves around the definitions in this statute. We can weave our way through equal protection law, a takings analysis, but at some point you have to turn back to what has happened in the market and what was the purpose of the legislative screen. I understand you to say that neither the term prearrange or hail is defined in the statute. That is correct. That is correct. But where does that leave you then? What does the statute say to distinguish between these possibly two different services? It doesn't. It doesn't. And that is the question. What you're left with is a history of interpretation by the Taxi and Limousine Commission about how it regulated this industry, how it filled in the intestines gaps of the statute to try to come up with meaning. And one of the things that it did in doing so is it defined a hail in the rise. In the rise of this age, it defined hails to include not just the physical verbal gestures, but the use of an electronic device to summon transportation, immediate transformation when you are currently ready to travel. It's a statutory definition promulgated and adopted by the TLC. It's consistent with the position that they took in court on the record two years prior to that. So now they basically are left to say when they try to defend the differences, well, you can basically do the same thing and you can push the button and you can hail a taxi cab electronically, which now the majority of all hails of any kind are electronic. It's not street hails that are the majority. When we talk about hails to include everything, electronic hails, whether for taxi, livery, or Ubers, are the majority form of how you hail immediate transportation. You've reserved a couple minutes. Yes, I have. We'll give you that. Thank you. Good morning. I'm Mackenzie Fillo and I represent the defendants here. The plaintiffs are not in a protected class, so we have, of course, the very deferential rational basis standard. And the agency's distinctions between prearrangements and street hails are not just rational, but extremely well thought out and based on decades of history and the legislative... Rational, because that's the test. So, as you were just discussing, the distinction is between a street hail and a prearrangement. And in the 80s is when this distinction arose. The black car industry first started in the 80s and the law first started distinguishing between a street hail and a prearrangement. And the basis was not time and how fast the car would come, as my colleague here suggests. It was about the passenger's ability to shop around. A passenger hailing a taxi in the street has no ability to shop around. At best, they can veto a particular taxi that stops and say, well, I don't want to get in that car. But they can't choose affirmatively to use taxis owned by a certain company because they trust that company. Someone prearranging service has a choice. They can call Carmel. They can use Uber. They can dial 7. They have options. And they can do their research. They can find out what those companies charge, what kind of cars they use. So those customers, because of the choices available to them, are not as vulnerable as the person in the street with their arm in the air. And so the commission has since then regulated taxis more heavily because they can pick up people in the street who can't shop around and regulated black cars less heavily because of the ability of the passenger to shop around. So we regulate safety for both. They are treated equally. The drivers are background tested and criminal fingerprinted. They have a license. Their cars are inspected three times a year. So for safety, we don't let people shop around. But when it comes to cost, the kind of car someone might want or need, in the black car segment, because the customer can choose and find a company that meets her to do any of the things that we require of taxis. Could you turn to the policy by which a lottery is used to determine which holders of medallions have to undergo the expense of transforming their cabs into accessorized? Sure. So we have developed a system by which, hopefully in a few years, half of the taxis will be wheelchair accessible. We determined that someone in a wheelchair in the street has— Is that required by a court order? I believe that the settlement agreement was ordered by the court. But we proposed the rule before it was settled. We proposed the rule. We adopted the rule. And then the case was settled. And so basically, the taxis will take turns using wheelchair accessible vehicles. And there's a system that will compensate them for the difference in price because the wheelchair accessible vehicle is a little bit more expensive. We've been collecting a surcharge for many years now from taxi passengers. Each medallion owner who uses an accessible vehicle will get $14,000 to offset the cost and $4,000 a year to offset the maintenance costs. And the driver—taxi passengers have been paying that for years. There's been a surcharge on every— In other words, wheelchair accessible taxis are more expensive? They are more expensive. To the rider? To every rider? To society, yes. The taxi riding public is paying for this, not the medallion owners. And that system is completely reasonable. It doesn't take anything from the plaintiffs. They continue to have their medallions. They continue to be able to use them. They are not, in fact, even required to ever get a wheelchair accessible vehicle. The scheme, the regulatory scheme, has a system where they can trade or like— How does somebody in a wheelchair know which passing vehicle is accessible to him or her? Well, I think they probably know which— First of all, there's a big wheelchair— You can tell from the back. Right. There's a wheelchair painted on the side and on the front, I believe, on the hood, yes. There are several symbols on the vehicle. I also think that the people who need those cars can identify them pretty easily, just as a matter of practicality, yes. And you see them all the time around here. I would like to go back, though, very quickly— If I want a cheaper ride, I should avoid those cabs, is that right? No. All taxi passengers are paying a 30-cent surcharge, no matter whether the vehicle is wheelchair accessible or not. And I think a lot of money has already been distributed to the medallion owners and the drivers who have been using these vehicles so far, because the system's already been in place for a while now. I would like to just go quickly back to the idea of time that my colleague here has been focusing on. That is a very Manhattan-centric view of the city. Maybe in lower Manhattan, an Uber comes very quickly, and just as quickly as a taxi. But the commission has to look out for the passengers of all five boroughs. And there are many parts of the city where you can stand in the street all day and you will not ever get a taxi because there are no taxis. And in those parts of the city, a black car will always come faster than a taxi. And so the speed with which the car comes cannot be the determining factor of whether something is a street hail or a prearrangement. The idea is whether the customer has choice. That is what determines whether it's a street hail or a prearrangement. And when you choose to use Uber, you give them your name, your phone number, your credit card number. You agree to arbitrate disputes with them under California law. So the green cars... Green cars are not allowed to pick people up in lower Manhattan. In fact, they were designed... Because taxis famously don't go to the other boroughs, the green taxis can only pick up passengers in the... But how about the question of disability, medallions, how does it... Oh, yes. The green taxis do not operate on a medallion system. They are sort of a hybrid in between a taxi and a black car. They're like a special category. They're not really at issue in this case. They were developed... The state created them a few years ago, and the state courts have held that that system is legal. I believe the taxis may have sued to stop it, but unsuccessfully. So many of those cars are also wheelchair accessible. And if the court... I don't know whether they are by law or they just are. I believe there's a program to encourage them to become wheelchair accessible, to participate in the agency's accessible dispatch program. So this is another reason why we don't necessarily require all black cars to be wheelchair accessible. We have this accessible dispatch program where people who want to prearrange service can call a number associated with the agency and have a car sent to them. Well, in any event, the city certainly has a rational basis for distinguishing between these two types of vehicles. Thank you. So the question before the district court was not whether there's a rational basis between HAILS and prearrangement. That inquiry is only relevant to the threshold determination of whether they're similarly situated for purposes of equal protection. The district court said, because a taxi can still pick up HAILS from the street, that that's a difference that renders them not similarly situated. On appeal, the appellees seem to back away from really challenging the notion that they're not similarly situated for equal protection purposes. And indeed, because taxis pick up eHAILS just like Uber, and an increasing majority of all taxi rides are arranged in exactly the same way. So instead, what the city says is that they have a rational basis for treating them differently. And that's the inquiry that the district court fell down on, because the question is, is the disparate treatment rationally related to a legitimate government objective? Here, we focus on appeal on the accessibility rules because the city's proffered rational basis here is to increase accessibility. But that is not rationally related to why you impose zero accessibility requirements on the black car sector while you impose a 50% accessibility requirement on the medallion taxi industry. And now the city has put forth rules... I hadn't understood that there is an accessibility requirement with respect to some percentage, maybe a quarter... Well, that's... For higher vehicles. And that's the thing. This court can take judicial notice of the fact that the city has now promulgated rules to do that. They haven't passed them, but they've promulgated them. And here's the important part. In doing so, they repudiate their own rational basis or their purported rational basis for why we imposed it on the taxi industry, but we didn't impose it on the FHV sector. They said, in fact, accessible vehicles are not available through the FHV sector. And the fact is, Uber, as an example, has gone from a few thousand cars when we started this to more than 60,000 vehicles. There's more than 100,000 vehicles traveling around in New York City, none of which are required to be accessible. There is no rational basis for imposing accessibility on the medallion taxi industry without doing so on anyone else. It may be... But the point is, if I want a... or if I'm handicapped and want a handicapped vehicle and I'm calling, I simply call one that I know is... and request one that is... Well, you may say that, but the city itself repudiated that thinking by saying they're not available because they're only going to be available if they're required to place them in service so that they're circulating around, picking up rides and other... So how they ultimately came up with a target of... or a goal or a requirement of 25% versus 50%, I don't know. What I say is that why it's material, why it's important, is because it negates their own rational basis for why we imposed it on taxis but not FHVs. If it's a court order, isn't compliance with a court order always rational? Well, the... Always a rational basis. That's to make it rational to impose it on the taxis, but there's no court order that says, and don't impose it on the FHV sector. So the question is the disparate treatment, and the consequences of the disparate treatment have been catastrophic. Make no mistake about it. We're talking about now a 90% drop in the value of the medallion in four years. All the niceties aside of what we're debating, an asset that has been stable, that was sold by the city for more than a million dollars four years ago and is now worth $130,000, that doesn't happen without some causal explanations, and one of them is the disparate treatment, and that's... I don't want to be flip, but this would not be the first industry that was destroyed by regulation. Yeah, the... It's unwise regulation if it destroys an industry, but the power to regulate is the power to destroy and to downgrade the value of assets. As long as there continues to be a rational basis for the policies that are promulgated, yes, but the very point in the complaint is that with respect to accessibility, there was no rational basis, and we alleged what we had to to negate any rational basis, including city admissions, and now before this court, in the context of the briefing on appeal, the city introduced this 25% requirement, and what was important about it is in doing so, they expressly said because accessible vehicles are not available in the FHV sector. I would think that what you're talking about is not dissimilar from what happened to the value of the New York Stock Exchange. So here's where, you know, Judge Posner, for example, in the Seventh Circuit likened this question to new forms of emerging competition and the idea that certainly the taxi owners in those cities didn't have a right to exclude new forms of competition. What your hypothetical or your question presupposes and that itself Judge Posner based it on was the idea that somehow this is new and different from what taxis do, but it is not. So taxis are doing exactly the same thing. I have on my phone right now, I obviously don't use Uber, but I have on my phone an app for taxis, and when I step outside, I'm going to push the button on my app and I'm going to get a taxi. Thank you. Well, reserve decision. At this time, we'll hear Rana versus Islam. Thank you.